# AFFIDAVIT OF SPECIAL AGENT MICHAEL BALESTRA

I, Michael Balestra, being duly sworn, depose and state:

## Introduction

1.  I am a Special Agent of the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I am currently assigned to the Office of the Special Agent in Charge, Boston, Massachusetts, and have been employed in that capacity since February 2007. Since that time, I have worked in several investigative groups within HSI. I am currently assigned to the Counter-Proliferation Investigations Group. I have received specialized training on how to conduct investigations involving the illegal exportation of weapons, technology, and other controlled commodities, and on the federal criminal statutes that regulate and, in certain instances, prohibit the export of U.S. controlled commodities, including weapons, weapons systems, military equipment and technology. Along with other special agents of HSI, I am responsible for investigating and enforcing violations of the Arms Export Control Act, 22 U.S.C. § 2778, as well as the Export Administration Regulations, 15 C.F.R. §§ 730-774, and the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., and relevant regulations. I have participated in several investigations of violations of United States laws relating to the unlawful export from the United States of goods, services, and technology restricted for export for reasons of national security, foreign policy, and anti-terrorism.

2.  During the course of my employment as a Special Agent, I have participated in the execution of numerous search warrants, arrest warrants, and physical surveillance operations. In addition, I have training and experience in interviewing and debriefing defendants who have violated federal law. In connection with my duties and responsibilities as a law enforcement

officer, I have testified in judicial proceedings and prosecutions. As a result of my training and experience, I am familiar with techniques and methods of operation used by individuals to illegally export defense articles and U.S. technology and to conceal their activities from detection by law enforcement authorities.

3. Along with other agents, I am investigating ARIF UGUR ("UGUR"), a 52-year-old Turkish national who has lived in the United States, including Massachusetts, intermittently since approximately 2002. UGUR became a Lawful Permanent Resident ("LPR") of the United States in approximately 2005.

4. I am submitting this affidavit in support of a criminal complaint charging UGUR with (1) conspiracy to export defense technical data controlled under the International Traffic in Arms Regulations ("ITAR") from the United States to Turkey without first obtaining required export licenses from the U.S. Department of State, in violation of Title 18, United States Code, Section 371 and the Arms Export Control Act, Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and ITAR, Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1; (2) exporting technical data controlled under the ITAR from the United States to Turkey without first obtaining required export licenses, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1; and (3) wire fraud, in violation of Title 18, United States Code, Section 1343.

5. As described in detail below, I have probable cause to believe that between approximately July 2015 and November 2017, UGUR conspired to and did illegally export certain defense articles — namely technical data related to various military parts and machine components — designated under Categories II and XX of the United States Munitions List ("USML"), from the United States to Turkey, without the required licenses or written authorizations from the U.S.

Department of State. I also have probable cause to believe that between approximately July 2015 and November 2017, UGUR, having devised a scheme to defraud the U.S. Department of Defense ("DOD"), caused to be transmitted by means of wire communications in interstate and foreign commerce emails and electronic bids to DOD containing false statements and material omissions, in violation of Title 18, United States Code, Section 1343.

6. I have personally participated in this investigation. The information set forth in this affidavit is based on my personal observations during this investigation and on information conveyed to me by other government and law enforcement officials. It also comes from, among other sources, records obtained from third parties and the review of materials found on seized electronic media. Because this affidavit is submitted for the sole purpose of seeking issuance of criminal complaints, it does not include every fact known to me concerning the investigation. Instead, I only have included those facts that I believe are needed to establish the requisite probable cause to support the criminal complaint.

### Relevant Legal Authority

7. At all times relevant to this application, the Arms Export Control Act ("AECA"), 22 U.S.C. § 2751 *et seq.*, has authorized the President of the United States to control the export of "defense articles" and "defense services." 22 U.S.C. § 2778(a)(1). The AECA also gives the President authority to designate items as "defense articles." The statutory authority of the President to promulgate regulations under AECA was delegated to the State Department by Executive Order 11958. The regulations, ITAR, 22 C.F.R. Parts 120-130, are administered by the U.S. Department of State's Directorate of Trade Controls ("DDTC").

8. The ITAR contains the USML, which sets forth specific items within a twenty-one-category list that are designated as either defense articles or defense services. *See* 22 C.F.R.

§ 120.2.  Such designations were made by the Department of State with the concurrence of the Department of Defense.  Under the ITAR, a defense article is defined as "any item or technical data that is designated" on the USML and "Technical Data" is defined as, among other things, "[i]nformation, other than software … which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles," including information in the form of "blueprints, drawings, photographs, plans, instructions or documentation."  22 C.F.R. §§ 120.6 & 120.10.

9. The USML is published at 22 C.F.R. § 121.1.  At all relevant times, Category II of the USML included various "Guns and Armament" and related technical data.  Category XX of the USML included "Submersible Vessels and Related Articles" and related technical data.

10. At all relevant times, before any defense article (including any related technical data) could be exported to another country, the AECA and ITAR required that an export license be obtained from DDTC.  In the application for an export license, the applicant/exporter was required to truthfully state, among other things, the nature of the defense articles to be exported, the actual "end user" of the defense articles, and the purpose for which the defense articles are intended.

11. Under the AECA and ITAR, it is unlawful for any person to knowingly and willfully fail to obtain an export license before exporting a "defense article" to another country. 22 U.S.C. § 2778(c) and 22 C.F.R. § 127.1(a)(1).  It is also illegal to conspire to export, attempt to export, or cause to be exported, any defense article without first obtaining the required license or written approval from DDTC.  22 U.S.C. § 2778(c); 22 C.F.R. § 127.1(a)(2)-(a)(4); 18 U.S.C. § 371.

12.     An "export" is defined under the ITAR as, among other things, "[s]ending or taking a defense article out of the United States in any manner … or [d]isclosing (including oral or visual disclosure) or transferring technical data to a foreign person, whether in the United States or abroad…." 22 C.F.R. § 120.17.

12.     Section 1343 of Title 18 of the United States Code states that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

**Facts Supporting Probable Cause**

I.    **Overview of the Allegations**

13.     In approximately 2015, UGUR founded the Anatolia Group Limited Partnership ("Anatolia"), a domestic limited partnership registered in Massachusetts. According to documents maintained by the Massachusetts Secretary of the Commonwealth, UGUR was Anatolia's sole managing partner. Documents that I have reviewed during this investigation describe Anatolia as a domestic manufacturer and supplier of specialty machinery and parts to DOD. At all times relevant to this investigation, Anatolia's corporate address corresponded to residential buildings in either Cambridge, Massachusetts or Indianapolis, Indiana.

14.     Between approximately July 2015 and September 2017, UGUR acquired dozens of contracts to supply DOD entities with various parts and hardware items used by the U.S. military. Many of these contracts required that the parts be "domestic end product," manufactured in the United States. In order to obtain these contracts, UGUR falsely represented to DOD that Anatolia

would manufacture the parts at facilities in the United States. In fact, Anatolia had no manufacturing capabilities whatsoever and many of the parts that Anatolia supplied to DOD and its affiliates were manufactured overseas, including by at least one manufacturer in Turkey (hereinafter the "Turkish Manufacturer"). Some of these parts were substandard and, therefore, could not be used for their intended military purpose.

15. In order to enable the Turkish Manufacturer to make some of the parts, UGUR provided the foreign manufacturer with technical specifications and drawings of the parts, which UGUR obtained from the Defense Logistics Agency ("DLA"). Several of these drawings and specifications were designated as defense articles, meaning a license was required to export the drawings and specifications to Turkey, or even to share them with non-U.S. persons or foreign persons located in the United States. However, UGUR failed to obtain the necessary export licenses prior to exporting these drawings and specifications to Turkey or sharing them with the Turkish Manufacturer.

## II. The DOD Contracting Process

16. The DLA is a component of DOD that provides worldwide combat and logistics support to the United States military by, among other things, supplying necessary parts and equipment to the Army, Navy, Air Force, Marine Corps, and Coast Guard.

17. DLA does not manufacture the parts, machine components, and other equipment utilized by DOD, but instead contracts with a variety of private contractors, including manufacturers and suppliers of domestic goods. In order to identify contractors capable of supplying needed parts and machine components to DOD, DLA solicits bids from contractors using an online bidding system called "DIBBS". Each DLA solicitation provides interested contractors with detailed information including the exact part being sought for purchase (typically

identified by a National Stock Number or "NSN"), the quantity of parts needed, the required delivery date for the parts, and any applicable special materials requirements. The solicitation will also typically indicate whether the requested parts and all associated technical data (specifications, drawings, etc.) are subject to U.S. export control laws and regulations.

18. I am aware that private contractors seeking to do business with DOD through the DIBBS system are first required to register with the System for Award Management ("SAM") database. In order to register with SAM, contractors must disclose certain corporate contact and financial information to DOD. Contractors registered with SAM are assigned a unique five-digit DOD identifier called a Commercial and Government Entity Code ("CAGE Code"). Using the CAGE Code, prospective contractors can access DIBBS and submit quotes in response to active DOD solicitations.

19. Contractors can obtain technical specifications and drawings related to active DLA solicitations through an online system known as DLA Collaboration Folders ("cFolders"). The cFolders system is a secure electronic database of technical specifications and drawings maintained by DLA, accessible through DIBBS. To access cFolders, a contractor must be registered in the SAM database and have an active CAGE Code. At any given time, cFolders contain technical specifications and drawings related to dozens, if not hundreds, of active DLA solicitations. Once DLA makes an award, however, the technical specifications and drawings related to that award are available only to the contractor that receives the award.

20. To gain access to technical data associated with DOD products or systems in cFolders that are subject to U.S. export controls such as the ITAR, contractors must obtain a special certification through the U.S/Canada Joint Certification Program ("JCP" or "JCP certification"). As part of the JCP application process, contractors are required to swear in writing that they

understand U.S. export control laws and agree not to disseminate technical data in a manner that would violate such laws. Contractors must also identify a person within their company – either a United States citizen or a U.S. LPR – who will act as custodian of all export controlled technical data accessed via DIBBS and cFolders.[1] Based upon this requirement and my understanding of the ITAR itself, foreign manufacturers (including manufacturers located in Turkey) are not eligible to obtain a JCP certification, nor are they permitted to access export controlled drawings and specifications in cFolders.

### III. UGUR Fraudulently Obtains DOD Contracts and Conspires to Violate, and Does Violate, the AECA

21. According to documents maintained by DLA, shortly after establishing Anatolia as a limited partnership in Massachusetts in July 2015, UGUR registered Anatolia with the SAM database and gained access to DIBBS using assigned CAGE Code 7ERN5.

22. In order to acquire access to technical specifications and drawings in cFolders, UGUR and Anatolia also applied to DLA for JCP Certification. In connection with his application for JCP Certification, UGUR agreed in writing on or about July 24, 2015 to act as Anatolia's custodian of "military critical technical data." In the same agreement, UGUR also acknowledged all responsibilities under applicable U.S. export control laws and regulations, including the ITAR, and he agreed not to provide access to or disseminate technical data to any person or entity contrary to U.S. export laws and regulations.

23. On or about August 13, 2015, DLA granted UGUR's request for JCP Certification, thus giving Anatolia and its representatives (including UGUR) access to technical specifications,

---

[1] For purposes of the ITAR, a U.S. person includes LPRs like UGUR. *See* 22 C.F.R. §§ 120.14 and 120.15 (defining person and U.S. person under the ITAR). Therefore, UGUR was allowed to access and view defense articles, including technical data, without a license. It was illegal, however, for him to disclose, share, or provide foreign, non-U.S. persons with access to defense technical data. *Id.*

drawings, and other information concerning active DLA solicitations in cFolders. That same day, via email, UGUR notified three Turkish nationals, identified herein as Individuals A, B and C, of Anatolia's JCP Certification along with instructions on how to access to cFolders.[2] UGUR's email to Individuals A, B and C included a document called a Military Critical Technical Data Agreement, signed by UGUR and JCP representatives from both the United States and Canada. The agreement made reference to "U.S. export control laws and regulations (including the obligation, under certain circumstances, to obtain an export license from the U.S. Government prior to the release of military critical technical data within the United States)" and it stated that UGUR (as Anatolia's representative) would not "provide access to military critical technical data to persons other than their employees or eligible persons…." I have reason to believe, therefore, that Individuals A, B and C were at least generally aware that technical data in cFolders was subject to U.S. export controls. Nonetheless, according to records maintained by DLA, cFolders was subsequently accessed using Anatolia's CAGE Code and other credentials from multiple Turkish IP addresses. I believe, therefore, that UGUR knowingly provided non-U.S. persons, including Individuals A, B and C, with access to cFolders (including its library of "military critical technical data") using Anatolia's credentials and that Individuals A, B and C knowingly accessed or caused other unauthorized persons to access cFolders.

---

[2] Some of the evidence in this case stems from a secondary inspection and border search of UGUR's electronic devices conducted by U.S. Customs and Border Protection ("CBP") and HSI in 2018. In April 2018, UGUR flew from Munich, Germany to Chicago. When he arrived in Chicago, UGUR was referred for secondary inspection by CBP. During the inspection, UGUR revealed that he was in possession of a cell phone and laptop computer, both of which he said he used for work-related purposes. At the conclusion of the secondary inspection, HSI detained both devices pursuant to its border search authority. HSI then forensically imaged and searched the devices for 60 days, at which time the border search was terminated, and the devices were officially seized by HSI pending the issuance of Rule 41 search warrants. The Rule 41 warrants were obtained in December 2018, at which time investigators continued searching UGUR's devices. No searches of the devices or forensic images of the devices took place between the end of the border search in May 2018 and the issuance of the Rule 41 warrants in December 2018. Since they were detained in April 2018, UGUR has never asked that his devices be returned to him.

24. According to emails that I have reviewed during this investigation, UGUR also shared Anatolia's DIBBS username and password directly with employees of the Turkish Manufacturer. In May, July and November of 2017, for example, UGUR emailed three separate employees of the Turkish Manufacturer to inform them that UGUR had recently changed Anatolia's DIBBS password. This password enabled UGUR and the employees to access cFolders, including all technical data and drawings related to active DLA solicitations. I have reason to believe that the Turkish Manufacturer, in fact, used the credentials provided by UGUR to access cFolders. In an email dated on or about July 20, 2017, for example, an employee of the Turkish Manufacture (identified herein as "Individual D") emailed UGUR telling him that "cFolders … requested for us to change the password." Individual D went on to provide UGUR with the updated cFolders password.

25. On or about May 16, 2016, Individual D emailed UGUR a spreadsheet listing more than 600 DLA solicitations. This, too, is consistent with Individual D — a non-U.S. person — having accessed cFolders. Each entry on the spreadsheet contained what appeared to be a DLA solicitation number, the name and quantity of the parts being sought by DLA, the part number (*i.e.,* the National Stock Number or "NSN"), the Turkish Manufacturer's list price, the Turkish manufacturer's estimated delivery time, and other information. In the body of the e-mail, which was translated from Turkish to English, Individual D wrote to UGUR, "You can give prices by adding 10% to the list price from the list I have sent. It is also better if you add 20 days extra for delivery times," or words to that effect. Based on this email, I believe that the Turkish Manufacturer was offering to manufacture DOD parts for Anatolia. The Turkish manufacturer instructed UGUR to quote prices to DLA that were 10 percent higher than the Turkish Manufacturer's production cost (presumably so that UGUR could make a profit) and to allow extra

time for the Turkish Manufacturer to deliver the parts to the United States. Shortly thereafter, UGUR began placing bids through DIBBS in response to active DLA solicitations.

*Bracket Assemblies*

26.   For example, on or about July 2, 2016, using Anatolia's CAGE Code, UGUR submitted a bid "without exception" in response to DLA solicitation "SPE7L1-16-T-7808." Based on my training and experience, I understand that a bid made "without exception" indicates that the bidder agreed to comply with all requirements listed in the solicitation (including, for example, the requirement that the goods be inspected at the place of manufacture prior to delivery to DOD). This solicitation sought the manufacture of eight "Bracket Assembly Mounting Seats" ("Bracket Assemblies"). These parts were to be used to mount 20mm heavy machine guns to various military vehicles. UGUR's bid stated that Anatolia would manufacture the Bracket Assemblies in the United States.

27.   On or about July 7, 2016, in response to an e-mail from a DLA contracting officer asking if Anatolia was the "actual manufacturer" of the Bracket Assemblies, UGUR wrote, "[W]e are actual [sic] manufacturer of the material and we have capabilities to produce the product." However, I am aware based on the investigation that Anatolia had no manufacturing facilities in the United States. Based upon UGUR's false and fraudulent response, DLA subsequently awarded Anatolia contract number "SPE7L1-16-M-2722" to manufacture the Bracket Assemblies. According to the DDTC, at all times relevant to this complaint, the Bracket Assemblies and related technical data were designated as defense articles under Categories II(j) and II(k) of the USML, respectively, and thus, a license or other written approval from DDTC was required in order to export the Bracket Assemblies or their technical data from the United States.

28.   On or about July 10, 2016, approximately three days after DLA awarded Anatolia

contract number SPE7L1-16-M-2722, UGUR submitted a purchase order to the Turkish Manufacturer for eight "Bracket, Mounting, Seat NSN: 1005-00-233-8920." The address of the Turkish Manufacturer explicitly printed on the purchase order was in Ankara, Turkey. I believe, therefore, that UGUR knew that the Turkish Manufacturer was, in fact, located in Turkey when he sent the purchase order. The bottom of the purchase order read, "If you have any questions about this purchase order, please contact ARIF UGUR …." The quantity and type of part identified in the purchase order sent to the Turkish Manufacturer are the same as those identified in DLA contract number SPE7L1-16-M-2722. Thus, I believe that UGUR utilized the Turkish Manufacturer — not Anatolia — to produce the Bracket Assemblies for DOD, and that the Bracket Assemblies were not manufactured in the United States.

29. Furthermore, based on my training and experience, in order to attempt to manufacture the Bracket Assemblies according to DOD's specifications, the Turkish Manufacturer would have required technical specifications and drawings of the Brackets which, as described above, were defense articles under Category II(k) of the USML. Therefore, by asking them to manufacture the Bracket Assemblies, I have reason to believe that UGUR caused employees of the Turkish Manufacturer to access these defense articles overseas, and that he did so without first obtaining a license or other written approval from DDTC.

30. In an email dated on or about July 27, 2016, a DLA purchasing agent asked UGUR to verify the "address of the actual manufacturing" of the Bracket Assemblies for the purpose of arranging an origin inspection (that is, an inspection of the parts at the place of manufacture by DLA to ensure that the parts comply with contractual specifications). In an email dated on or about July 28, 2016, UGUR told the contracting agent that the Bracket Assemblies were being manufactured by Anatolia at 90 Woodmont Road in Milford, Connecticut. I believe this

statement was false, as UGUR knew that the Bracket Assemblies were being manufactured by the Turkish Manufacturer in Turkey.

31. UGUR subsequently caused the Bracket Assemblies to be delivered to DOD in late August 2016 without allowing DLA to first inspect the parts at the place of manufacture. I believe that UGUR intentionally avoided the origin inspection in order to conceal from DLA the true place of manufacture: Turkey. Upon receiving the Bracket Assemblies, DOD determined that they failed to meet contractual specifications. DOD declined to pay UGUR and Anatolia for the Brackets, and they attempted (unsuccessfully) to return the parts to UGUR.

*Groove Pulleys*

32. On or about June 7, 2016, using Anatolia's CAGE Code, UGUR submitted a bid "without exception" in response to DLA solicitation number SPE7L4-16-T-5153. This solicitation sought the manufacture of nine Groove Pulleys identified as NSN 3020014837634. These parts were intended for use by the United States Navy, Naval Sea Systems Command. UGUR's bid stated that Anatolia would manufacture the Groove Pulleys in the United States.

33. On or about August 22, 2016, in response to UGUR's bid, DLA awarded Anatolia contract number SPE7L4-16-V-1996 to manufacture the Groove Pulleys. The contract required that the parts be manufactured in the United States. The following day, on or about August 23, 2016, UGUR downloaded the technical specifications and drawings associated with the Groove Pulleys from cFolders. The specifications and drawings were marked with the following warning: "This document contains critical data whose export is restricted by the Arms Export Control Act (Title 22 U.S.C. Sec. 2841 et seq.) … Violations of these export laws are subject to severe criminal penalties." I have since confirmed with the DDTC that the Groove Pulley's and related technical data are, in fact, designated as defense articles under Categories XX(c) and XX(d) of the USML,

respectively. Thus, a license or other written approval from DDTC was required in order to export the Groove Pulleys or their technical data from the United States. Nonetheless, on or about August 23, 2016, UGUR e-mailed the technical data related to the Groove Pulleys to Individual D, an employee of AYPIK located in Turkey, without the necessary export license or written approval.

34.     On or about September 16, 2016, a DLA representative emailed UGUR and asked him to confirm the actual place where the Groove Pulleys were being manufactured. UGUR told the DLA representative that Anatolia was "going to manufacture [the Groove Pulleys]" and he provided the name and address of a machine shop located in Milford, Connecticut where he said the parts were being manufactured. Although UGUR provided DLA with the name and address of a legitimate manufacturing company, I have learned that the company has never had business dealings with UGUR or Anatolia, nor did the company manufacture the Groove Pulleys identified in DLA contract number SPE7L4-16-V-1996 at its facility in Milford.

35.     During the investigation of UGUR, agents also discovered an email from UGUR to Individual D, an employee of the Turkish manufacturer, attaching a series of eight purchase orders submitted by UGUR (on behalf of Anatolia) to the Turkish Manufacturer between approximately July and September 2016. One of the purchase orders called for the Turkish Manufacturer to produce, at UGUR's request, nine Groove Pulleys identified as "NSN 3020-01-483-7634." The quantity and type of parts listed in the purchase order are identical to the quantity and type of parts listed in DLA contract number SPE7L4-16-V-1996. Furthermore, the date on the purchase order, August 23, 2016, was just three days after DLA awarded Anatolia contract number SPE7L4-16-V-1996. I believe, therefore, that the Turkish Manufacturer, not Anatolia, manufactured the Groove Pulleys and that UGUR concealed this fact from DOD.

36. UGUR subsequently caused the Groove Pulleys to be delivered to DOD in or about October 2016 without allowing DLA to first inspect the parts at the place of manufacture. I believe that UGUR intentionally avoided the origin inspection in order to conceal from DLA the true place of manufacture: Turkey. Upon receiving the parts, DOD determined that they failed to meet contractual specifications. Nonetheless, DOD was able to make use of the parts in the field.

*Locking Device Valve*

37. On or about August 24, 2016, UGUR sent an email to Individual D, an employee of the Turkish Manufacturer located in Turkey, and a non-U.S. person, attaching technical specifications and drawings related to a then-active DLA solicitation that called for the manufacture of "locking device valves." UGUR asked the employee whether he should "bid" on the solicitation.

38. The specifications and drawings that UGUR sent to the Turkish Manufacturer were marked with the following warning: "This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec. 2751 et seq.) or Executive Order 12470. Violations of these exports laws are subject to severe criminal penalties." I have since confirmed with the DDTC that the Locking Device Valves and related technical data are, in fact, designated as defense articles under Categories XX(c) and XX(d) of the USML, respectively. Thus, a license or other written approval from DDTC was required in order to export the Locking Device Valve or its technical data from the United States, or even to share the technical data with a non-U.S. person. However, UGUR failed to obtain an export license or other written approval from DDTC prior to emailing the technical data to the Turkish Manufacturer on or about August 24, 2016.

## Conclusion

39. Based on the foregoing facts, and on my experience, training, and discussions with other individuals involved in this investigation, I have probable cause to believe that ARIF UGUR (1) conspired with Individuals A, B, C and D, among others, to export defense technical data controlled under the USML from the United States to Turkey without first obtaining required export licenses from the U.S. Department of State, in violation of Title 18, United States Code, Section 371 and the AECA, Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and the ITAR, Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1; (2) exported technical data controlled under the USML from the United States to Turkey without first obtaining required export licenses, in violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c) and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1; and (3) committed wire fraud, in violation of Title 18, United States Code, Section 1343 by devising a scheme to fraudulently obtain contracts from DOD.  Therefore, I request that a criminal complaint be issued charging ARIF UGUR accordingly, and that an arrest warrant also be issued.

MICHAEL D BALESTRA
*Digitally signed by MICHAEL D BALESTRA*
*Date: 2021.06.21 10:31:06 -04'0*

Michael Balestra
Special Agent
Homeland Security Investigations

Subscribed to and sworn to me telephonically on this __21__ day of June, 2021.

JENNIFER C. BOAL
United States Magistrate Judge